Ex. 1

1               UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                   Alexandria Division

3

4    THOMAS SEHLER, et       :
     al.,                    :
5                            :
          Plaintiffs,        :
6                            : Civil Action No.
     v.                      : 1:13-cv-00473-JCC-TRJ
7                            :
     PROSPECT MORTGAGE,      :
8    LLC,                    :
                             :
9          Defendant.        :

10

11

12                   DEPOSITION OF

13              ALLISON D. COUGILL

14

15          Wednesday, November 13, 2013

16                   11:03 a.m.

17

18               Seyfarth Shaw, LLP
                 975 F Street, N.W.
19               Washington, D.C.

20

21

22          Terry L. Bradley, Court Reporter



1    question until I'm more specific.

2            I just, you know, I'm not a

3    salesperson right now.  So are you referring to

4    when I was?  Or --

5        Q.    Is it your claim that you are not

6    currently a salesperson?

7        A.    I am not hired as a salesperson, no.

8    I'm a loan originator.

9        Q.    And what's the difference between

10   being a salesperson and a loan originator?

11       A.    I originate loans.  I take loan

12   applications over the phone.  I take them in

13   person.  I don't go out on the street and sell

14   anything.

15       Q.    So it's your position in this case

16   that you are not a salesperson?

17       A.    I am not a salesperson.

18       Q.    Then why don't you tell me what

19   your --

20            -- how you would define a successful

21   loan officer.

22       A.    The ability to build relationships



ALLISON COUGILL                              November 13, 2013
THOMAS SEHLER v. PROSPECT MORTGAGE                        13

```
 1   with my referral partners.  The ability to know

 2   my product and how to relate that to my

 3   clients' needs for a loan.  We have so many

 4   different loan products, I need to know every

 5   one and how that would relate to what they

 6   would specifically need from me.

 7       Q.    Anything else?

 8       A.    Specifically, computer knowledge,

 9   how to, you know, work the software, how to

10   market -- you know, I have marketing materials,

11   but those are provided to me.  So I use those

12   marketing materials -- and be truthful, be

13   honest, have integrity, and you know, build

14   relationships.  That's what I feel like my job

15   is about is being able to build relationships

16   for the clients I do work with so they can

17   refer business back to me for their friends,

18   family, for repeat business, and I think that's

19   why I have been successful for the 15 1/2 years

20   I've been in the mortgage business.

21       Q.    So would you say that building

22   relationships is the most part of your job?
```



1      A.     Yes.

2      Q.     And so how do you build

3   relationships with people?

4      A.     I answer their questions honestly,

5   truthfully, listen to their needs.  And when I

6   feel like I understand their needs, I use my

7   product knowledge and my experience to be able

8   to find the right product for them to bring

9   them a mortgage.

10     Q.     Well, how do you meet them?

11     A.     How do I meet whom?

12     Q.     Your contacts.  How do you have

13   contacts?

14     A.     I have different types of contacts.

15   I have clients that I do loans for, and I have

16   referral partners.  So which specifically are

17   you talking about?

18     Q.     Let's talk about your referral

19   partners first.

20     A.     Okay.

21     Q.     So how do you get referral partners?

22     A.     I market to them through e-mail,

1    through maybe networking associations.

2       Q.    Anything else?

3             (Witness nodded.)

4             About how many referral partners

5    would you say you have?

6       A.    Currently?

7       Q.    Yes.

8       A.    15, 20.

9       Q.    Besides marketing through e-mail and

10   networking, how else do you obtain referral

11   partners?

12      A.    I assume that people through word of

13   mouth, you know, tell --

14            If I have a referral partner and

15   somebody else hears that I'm doing a good job

16   for them, that they maybe verbally tell

17   them within the same office.

18            I've been doing it for 15 1/2 years.

19   I just have a reputation that I do my job well.

20   And you know, somebody gives my name to their

21   co-worker, and they might call me.

22      Q.    So let's talk about networking.  How



1    do you network to get referral partners?

2         A.    I used to belong to a networking

3    called BNI Group, called BNI, Business Network

4    International.  But I don't any more.

5         Q.    How long were you a member of

6    Business Network International?

7         A.    Maybe three years.

8         Q.    And so you would attend their

9    events?

10        A.    A lunch.  It was a 1-hour lunch, 1

11   1/2-hour lunch each week.

12        Q.    What years were you a member of BNI?

13        A.    2011, 2010, maybe 2009.  I'm not

14   sure.

15        Q.    So while you worked at Prospect,

16   right?

17        A.    Correct.

18        Q.    How else do you network to get

19   referral partners?

20        A.    That's it.

21        Q.    That's the only way you networked?

22        A.    That's the only way I networked.



1   can tell you how many open houses I usually

2   did, but not as a result of the Hour of Power.

3        Q.    Okay.  Well, how many open houses

4   did you usually do?

5        A.    I used to do two every month at

6   least at a minimum.  They were on the weekends.

7        Q.    How long would they last?

8        A.    Four hours.

9        Q.    Four hours each?

10              (Witness nodded.)

11              And where would they take place?

12       A.    Anywhere there was an empty, cold,

13   foreclosed property that the agent didn't want

14   to open that I was able to get into to open for

15   them.  They were everywhere all over the

16   Richmond area.

17       Q.    So you did these open houses in the

18   Richmond area?

19       A.    The greater Richmond area.

20   Richmond, Petersburg.  Greater Richmond area.

21       Q.    In this lawsuit are you claiming

22   that you when you worked at Prospect Mortgage



1   that you spent a majority of your time in the

2   office?

3       A.    Yes.

4       Q.    And why is that?

5       A.    Because I did.

6       Q.    How much time did you spend working

7   in the office when you were working for

8   Prospect?

9       A.    Eight hours, nine hours, ten hours a

10  day.

11      Q.    Every day?

12      A.    Almost every day.

13      Q.    What percentage of time would you

14  say that you were spending in the office per

15  week?  Percentage of time in the office versus

16  the total amount of time that you were working

17  for Prospect.

18      A.    99.9 percent of the time I spent in

19  the office working for Prospect.

20      Q.    And how many hours total are you

21  claiming that you worked per week for Prospect?

22      A.    50, 60 hours a week.



```
 1   us a very nice, you know, commission plus a

 2   draw.  Which we all thought was great

 3   compensation for the hours that we worked and

 4   the amount of aggravation and stress we had to

 5   go through.

 6        Q.    And so how much were you making per

 7   year at IndyMac?

 8        A.    80,000, 85,000.

 9        Q.    And that was based solely on

10   commissions?

11        A.    Plus a draw.

12        Q.    And you didn't earn overtime pay

13   while you were working at IndyMac?

14        A.    Not that I know of.

15        Q.    You didn't have to record your hours

16   and report them to anyone?

17        A.    No, I did not.

18        Q.    Did anybody tell you at IndyMac that

19   you were expected to spend a certain amount of

20   time outside the office?

21        A.    No.

22        Q.    At some point IndyMac became
```



1   Prospect, right?

2       A.    Correct.

3       Q.    Do you remember when that was?

4       A.    A year to the day, almost, that we

5   became IndyMac.  Sometime around the end of

6   July of 2008.

7       Q.    And did Prospect take on all the

8   loan officers that were in the IndyMac office?

9       A.    Yes.

10      Q.    Before we talk about your tame spent

11  at Prospect, I just want to talk about what

12  you've done since you've left Prospect.  So you

13  left Prospect in 2011?

14      A.    Correct.

15      Q.    Where did you work after leaving

16  Prospect?

17      A.    I worked for Brand Mortgage,

18  B-R-A-N-D, Mortgage.

19      Q.    Beginning immediately after leaving

20  Prospect?

21      A.    I resigned one day from Prospect and

22  went to work the next for Brand.

1    A.    Correct.

2    Q.    At any time during your three years

3  at Prospect, did you complain to anybody at

4  Prospect about the commission structure?

5    A.    Yes.  We all talked about Rick

6  Eaheart.  When I resigned --

7    Q.    Can you hold one second.  I just

8  want to get my entire question out.

9         Who did you complain about a

10 commission structure --

11        To whom did you complain about the

12 commission structure at Prospect?

13   A.    Rick Eaheart.

14   Q.    Anybody else?

15   A.    Doug Houston.

16   Q.    Anybody else?

17   A.    Those were who I reported to.

18 Nobody else.

19   Q.    Did you ever tell Rick Eaheart that

20 you thought you should be paid overtime?

21   A.    No.

22   Q.    Did you ever tell Doug Houston that

ALLISON COUGILL
THOMAS SEHLER v. PROSPECT MORTGAGE
November 13, 2013
1   you should be paid overtime?

2       A.    No.

3       Q.    Do you understand that you opted

4   into a collective action in California against

5   Prospect called Sliger versus Prospect, right?

6       A.    I don't know.  I just opted into a

7   case, but I felt like I should be fairly

8   compensated for my time that I worked there.

9       Q.    You understand you opted into a case

10  against Prospect --

11      A.    Yes.

12      Q.    -- to obtain overtime compensation?

13      A.    Fair pay and overtime.  Yes.

14      Q.    What do you mean when you say "fair

15  pay?"

16      A.    Again, being paid fairly for the

17  hours that I worked and for the amount of work

18  they required me to do to do my job.

19      Q.    Well, if I told you that case was

20  named Sliger, S-L-I-G-E-R, does that sound

21  familiar?

22      A.    No.



800.211.DEPO (3376)
EsquireSolutions.com

1              -- personal Yahoo account to send

2      yourself documents or to send documents to

3      yourself from Prospect?

4          A.    No.

5          Q.    You started working for Prospect

6      around July or August 2008, right?

7          A.    Yes.

8          Q.    That was about the time that IndyMac

9      transitioned over to Prospect?

10         A.    Yes.

11         Q.    Did you work at the Richmond office

12     throughout your employment with Prospect?

13         A.    Yes.

14         Q.    And who was your supervisor in the

15     Richmond office?

16         A.    Rick Eaheart t.

17         Q.    Who was Rick's supervisor?

18         A.    Doug Houston.

19         Q.    Eventually your supervisor switched

20     to Arthur Smith, right?

21         A.    Correct.

22         Q.    If I told you that was around

1   December 1st, 2010, does that sound about

2   right?

3        A.      Probably.  I was thinking January,

4   so that was probably right.

5        Q.      And why did your supervisor switch?

6        A.      I don't know.

7        Q.      When Prospect took over IndyMac did

8   you have to make any sort of representations to

9   Prospect about your loan production or anything

10  about how many referral sources you had?

11       A.      No.

12       Q.      Prospect just took on all the loan

13  officers that were working for IndyMac?

14       A.      Yes.

15       Q.      About how many referral sources did

16  you have at the time?

17       A.      From the time that I became Prospect

18  or IndyMac.

19       Q.      Yes.  At the time that Prospect took

20  over IndyMac?

21       A.      I don't know.

22       Q.      Can you estimate?

1        A.    25.

2              (Exhibit 4 marked for

3   identification.)

4        Q.    The court reporter has just handed

5   you what's been marked as Cougill Exhibit 4.

6   Do you recognize this document?

7        A.    Yes.

8        Q.    And this is your Loan Officer

9   Compensation Plan for when you were at

10  Prospect, right?

11       A.    Yes.

12       Q.    And it's dated August 8, 2008?

13       A.    Yes.

14       Q.    And if you turn to the third page of

15  the document where there's a signature where it

16  says "Allison Cougill, Loan Officer", right?

17       A.    Yes.

18       Q.    And that's your signature?

19       A.    Yes.

20       Q.    And you've signed this document on

21  July 31st, 2008, right?

22       A.    Yes.

1      Q.    So if you look at the third page of

2  the document at the top of the third page

3  there's a paragraph entitled, "FLSA Status."

4            Do you see that paragraph?

5      A.    I do.

6      Q.    And that paragraphs says:

7            "This outside sales position has

8  been deemed exempt based on the requirements of

9  the Fair Labor Standards Act and applicable

10  state law.  Employee agrees to comply with the

11  requirements of Prospect Mortgage's Employee

12  Agreement Regarding Outside Sales Activities,

13  including completing a Quarterly Exemption

14  Certification".

15            And by signing the compensation plan

16  you were agreeing with that paragraph, right?

17      A.    No, I was not.

18      Q.    You were not agreeing with that

19  paragraph?

20      A.    That's the paragraph that Rick

21  Eaheart brought to our attention that we didn't

22  agree with but we were told we had to sign this



1       Q.     Right.  The language right above

2   your signature on the third page of the

3   compensation plan says:

4            "By executing this compensation plan

5   I acknowledge that I have read, understand and

6   agree to all terms and conditions of this

7   plan."

8            And you agreed with that, right?

9       A.    Yes.

10      Q.    And so you agreed with the plan?

11      A.    Yes.

12            (Exhibit 5 marked for

13   identification.)

14      Q.    The court reporter has handed you

15   what has been marked as Cougill Exhibit 5.  Do

16   you recognize this document?

17      A.    Yes.

18      Q.    This is the loan officer

19   employment --

20            Your Loan Officer Employment

21   Agreement, right?

22      A.    Yes.



1      Q.      And the effective date is August 8,

2    2008?

3      A.      I guess.  I guess so.

4      Q.      And there if you look at the bottom

5    of each page in the right --

6              -- bottom right hand corner, there

7    are initials on each page, right?

8      A.      Right.

9      Q.      And are those your initials?

10     A.      Yes.

11     Q.      You initialed those pages?

12     A.      Yes.

13     Q.      And by initialing these pages you

14   were saying that you had read and understood

15   the terms on that page, right?

16     A.      Correct.

17     Q.      And if you look at Page 4 of the

18   agreement, there is no signature where it says

19   "Allison Cougill, Loan Officer".  Do you

20   remember signing this agreement?

21     A.      No.

22     Q.      Do you think there is any reason why



```
 1    you would initial the page but not sign the

 2    agreement?

 3         A.    I don't know.  Maybe I didn't agree

 4    to sign it.  I don't know.

 5         Q.    If you look at the first page of the

 6    agreement, there's a paragraph, Paragraph e

 7    titled "Duties and Responsibilities".  Do you

 8    see that?

 9         A.    Yes.

10         Q.    Now, there's a sentence that begins

11    towards the end of that paragraph that says:

12              "Employee understands and

13    acknowledges that in performing duties on

14    behalf of Prospect Mortgage, employee shall

15    comply with the terms of Prospect Mortgage's

16    Employee Agreement Regarding Outside Sales

17    Activities and meet or exceed the minimum

18    performance goals set in the Loan Officer

19    Performance Improvement Plan."

20              Do you see that language?

21         A.    Yes.

22         Q.    And by initialing this agreement you
```



```
 1   acknowledge that you've read and understood and

 2   agreed with that paragraph, right?

 3        A.    I was never part of the Loan Officer

 4   Performance Improvement Plan.

 5        Q.    You were never part of the Loan

 6   Officer Performance Improvement Plan?

 7        A.    I was not.

 8        Q.    But you otherwise agreed to the

 9   terms in that paragraph, right?

10        A.    Yes.

11              (Exhibit 6 marked for

12   identification.)

13        Q.    The court reporter has just handed

14   you what's been mark this as Cougill Exhibit 6.

15   Do you recognize this document?

16        A.    Yes.

17        Q.    This is the Loan Officer Performance

18   Improvement Plan, right?

19        A.    Correct.

20        Q.    And if you look at that time 4th

21   page of the document, there's a signature above

22   the name "Allison D.  Cougill".  Do you see
```



1    that?

2         A.    Yes.

3         Q.    And that's your signature, right?

4         A.    Correct.

5         Q.    And you signed this document on

6    July 31st, 2008?

7         A.    Correct.

8         Q.    Now on the first page of the

9    Performance Improvement Plan, there's a

10   paragraph titled "Minimum Standards".  Do you

11   see that?

12        A.    Yes.

13        Q.    And that paragraph outlines the

14   standards and expectations of loan officers,

15   right?

16        A.    Correct.

17        Q.    And by signing this document you

18   agreed to be subject to those standards, right.

19        A.    Correct.

20              (Exhibit 7 marked for

21   identification.)

22        Q.    The court reporter has just handed

1    Status".  You see that?

2        A.    Yes.

3        Q.    And that paragraph states:

4              "Once the employee receives his or

5    her license from the state in which employee

6    will originate loans, employee will be an

7    outside sales position that is exempt from the

8    requirements of the Fair Labor Standards Act

9    and applicable states law."

10             You see that language?

11       A.    Yes.

12       Q.    And by initialing that law you

13   agreed to that language, right?

14       A.    Yes.

15       Q.    You agreed your position was an

16   outside position?

17       A.    My position was never an outside

18   sales position, but if that's what they wanted

19   to say, that's fine.  But I didn't agree to

20   that, but I signed it.  Yes.

21       Q.    But Prospect's expectation was you

22   were going to be an outside salesperson, right?



1       A.      According to this.  Yes.

2               (Exhibit 8 marked for

3    identification.)

4       Q.      The court reporter has handed you

5    what's been marked Cougill Exhibit 8.  Do you

6    recognize this document?

7       A.      Yes.

8       Q.      This is the Employee Agreement

9    Regarding Outside Sales Activities, right?

10      A.      Yes.

11      Q.      And if you look at Page 3 there's a

12   signature above the name "Allison D. Cougill",

13   and you see that?

14      A.      Yes.

15      Q.      And that's your signature, right?

16      A.      Yes.

17      Q.      And you signed this document on

18   July 31st, 2008, right?

19      A.      Yes.

20      Q.      Now, what did you understand this

21   agreement to mean when you signed it?

22      A.      I didn't read it to understand it.



```
 1    I've done my job the same way for 15 years.  So

 2    by signing this agreement, I just signed it so

 3    I could keep my job.

 4        Q.    Right.  But you --

 5              Even though you had been in the loan

 6    industry for a number of years, you were

 7    starting with a new employer, right?

 8        A.    Basically.

 9        Q.    When you started with Prospect?

10        A.    Basically.

11        Q.    And so it was reasonable that

12    Prospect might have had different expectations

13    than your previous employers.  Is that right?

14        A.    Not to me.

15        Q.    It wasn't reasonable to you that

16    they have different expectations?

17        A.    No.  Because Prospect Mortgage was

18    American Home Mortgage who I had worked for for

19    the previous four years and they had never

20    changed anything as far as my duties as a loan

21    officer.  Prospect Mortgage was old American

22    Home Mortgage, the same management, the same
```



```
 1    person.
 2        Q.      Your own manager told you not to
 3    sign the agreement, right?
 4        A.      Correct.
 5                My manager --
 6        Q.      There's no question before you.
 7                Now, Paragraph 5 of Exhibit 8, the
 8    Agreement Regarding Outside Sales Activities,
 9    talks about quarterly exemption certifications.
10    Did you ever --
11                Did you ever certify on a quarterly
12    basis for Prospect Mortgage that your primary
13    duty was outside sales?
14        A.      I've never seen that agreement.
15        Q.      You've never completed a quarterly
16    exemption certification?
17        A.      Never.
18        Q.      If you turn to Page 2 of the
19    Agreement Regarding Outside Sales.  Paragraph 4
20    outlines procedures for you to contact human
21    resources if you're unable to comply with the
22    outside sales exempt duties requirements in the
```



1    position.

2           Did you ever contact human resources

3    or the Vice President of human resources and

4    tell them that you were not able to comply with

5    the outside sales exempt duties requirements?

6       A.   No, I did not.

7       Q.   Earlier in this deposition you told

8    me that your job as a loan officer was not to

9    sell loans.  It was to originate loans.  Is

10   that right?

11      A.   That's correct.

12      Q.   How do you originate a loan?

13      A.   I either call or get a call from a

14   borrower who gives me all of their information

15   that I have to fill out on an application, and

16   fill that out, and that's an origination.

17      Q.   So you're position is that filling

18   out a loan application is an organization?

19      A.   According to RESPA?

20      Q.   Well, there are a number of steps

21   that you have to do before you get there,

22   right?  Earlier you talked about identifying



```
 1    products and having knowledge about the loan

 2    products that you are offering.  Is that right?

 3        A.    Yes.

 4        Q.    So you have to match up a loan to

 5    the need of the buyer, right?

 6        A.    Correct.

 7        Q.    So they have to --

 8              And you want your --

 9              You want that buyer to pick your

10    loan product over a competitor's loan product,

11    right?

12        A.    Correct.

13        Q.    And you offer a number of different

14    products so you're going o help them try to

15    figure out which ones best fit their needs?

16        A.    Correct.

17        Q.    And at the end of the day if they

18    decide to get a product from you, they're

19    buying that product, right?

20        A.    They're not buying it, no.  I mean,

21    I don't sell it.  There's no cost on it.  I do

22    my job for free.  I don't have an origination
```



1    fee or I don't charge an application fee or

2    anything so they're not buying anything.

3        Q.     You're not doing your job for free,

4    right?  You're getting a commission.

5        A.     If I don't get that loan I work for

6    free.

7        Q.     Well, but your end goal is to get

8    them to buy the loan so that the company can

9    make a profit off of that, right?  The company

10   will get --

11       A.     They're not buying anything.

12       Q.     The company will get a revenue from

13   the loan that the buyer eventually gets, right?

14       A.     Correct.

15       Q.     And you get a commission off of

16   that, right?

17       A.     Yes.

18       Q.     So what is the difference between

19   that and doing sales?

20       A.     I don't have anything to sell.  I'm

21   not selling anything.

22       Q.     Well, how can you say you're not



```
 1    selling something when at the end of the day

 2    you're trying to get the buyer to choose your

 3    product over somebody else's product.  Isn't

 4    that the same thing?

 5         A.     I don't have --

 6              I have nothing tangible to sell them

 7    with like I did a copier going door-to-door and

 8    say:

 9              Here's my product.  Buy it from me.

10              My product is like everybody else's

11    product.  I'm not selling it.  I'm just out

12    there selling my company, the company itself,

13    an image, my image, my trust, and I do that

14    over a phone call.  I have ten minutes to

15    convince a borrower that they can trust me with

16    their information that they're giving me over

17    the phone, their social security number for me

18    to pull their credit, all their asset

19    information.  I have to build trust in somebody

20    over a five to ten minute period while I've got

21    them on the phone.  That's all I have to sell.

22    It's just me, my trust, and that's it.  If they
```



1   feel good, they might give me their information

2   over the phone so I can get their application.

3   Then I can do my job to figure out where the

4   information they gave me, what product best

5   suits there needs, whether I even have a

6   product that suits their needs or not.

7       Q.   So you're selling a service.  Is

8   that what you're saying?

9       A.   Yes.

10      Q.   So you're selling a service, the

11  service of you taking their loan application?

12      A.   I'm selling trust in myself so I can

13  sell a service later, I suppose.  I'm not

14  selling anything because I don't get paid for

15  it.  I don't get paid until it's closed.  If

16  that loan never closes --

17          There's lots and lots and lots of

18  applications that I have take that never close

19  and I never get paid for.

20      Q.   But did end game, I mean, you're

21  bringing in loans with the idea that they're

22  eventually going to be closed, right?



```
 1    Would you say you attended at least one a

 2    month?

 3         A.    Yes.

 4         Q.    At least two?

 5         A.    I don't know.

 6         Q.    At least once a week?

 7         A.    No.

 8         Q.    Not once a week?

 9         A.    No.  Not once a week.

10         Q.    But at least one to two times a

11    month?

12         A.    Yes.

13         Q.    And how long do the closings last?

14         A.    Anywhere from 30 minutes to an hour.

15         Q.    And where would they take place?

16         A.    In an attorney's office.

17         Q.    Did you attend open houses when you

18    worked at Prospect?

19         A.    Yes.

20         Q.    How often?

21         A.    Before I left Prospect, in probably

22    in 2010 and '11, I probably did one to two a
```



```
 1   weekend for the last two years.
 2        Q.    And how long would you spend at each
 3   open house?
 4        A.    At least four hours.
 5        Q.    Could it be sometimes more?
 6        A.    More than four hours?
 7        Q.    More than four hours.
 8        A.    It could have been.  Maybe if they
 9   were busy or if there were traffic through,
10   like a lot of traffic.  By the time I got them
11   set up or shut down it might be four or five
12   hours total.
13        Q.    And where would those open houses
14   take place?
15        A.    They would take place in foreclosure
16   listings of agents that were assigned to us by
17   Prospect to work.
18        Q.    And are those in the Richmond area?
19        A.    Yes.
20        Q.    And how far around your office would
21   they be?
22        A.    Some would be 30, 35 miles away.
```



```
 1   Some could be a mile from my house.  They were

 2   on the weekends.  So from my house I remember

 3   doing one or two in my neighborhood.  Most of

 4   them were like 15 to 30 minutes away.

 5      Q.   And so if they're on the weekend you

 6   would leave your house in order to --

 7           You wouldn't go from the office to

 8   an open house?

 9      A.   There were occasions when I had to

10   go to the office before to print materials to

11   bring to the open house.  So if I had to do

12   that I would run to the office, make copies,

13   make prints, marketing stuff that we had to

14   have filled out and bring to the open house.

15      Q.   Did you do Home Buyer Seminars when

16   you worked at Prospect?

17      A.   Yes.

18      Q.   How often?

19      A.   Maybe once every two months for a

20   while.  Not every year.  Not every month.

21      Q.   And how much time is involved doing

22   a Home Buyer Seminar?
```



1      A.      Two hours.  About two to three hours

2   each.

3      Q.      And where would those seminars take

4   place?

5      A.      Different places.  I taught the

6   Virginia housing.  It was VHD, a Home Buyer

7   Classes for the military at Fort Lee.  That was

8   in Petersburg, Virginia, which is about

9   45 minutes from Richmond.  I did that every

10  other month for about a year.

11     Q.      So six times you did that?

12     A.      Probably.

13             And every now and then we'd have one

14  or two at a church or a real estate office.

15     Q.      So that's in addition to these VHD

16  Home Buyer Seminars?

17     A.      Yes.

18     Q.      And what days of the week would

19  those VHD Home Buyer Seminars take place on?

20     A.      The ones I did were particularly

21  Tuesday and Thursday nights from like 5 to 9.

22     Q.      The ones that you did at a church or



1    other places, where were they?

2         A.    They would typically be like on a

3    Saturday morning.  Maybe you know, 10 to 1.

4         Q.    And how often did you do those?

5         A.    Not very often.  I probably did

6    three total that I remember doing.

7         Q.    Three total while you were working

8    at Prospect?

9               (Witness nodded.)

10              And where would those be located?

11        A.    I remember doing one in a church.  I

12   remember doing several in the real estate

13   office, one of the realtors that I worked with.

14   We did it in their office a couple of times.

15        Q.    Are those all in the Richmond area?

16        A.    Oh, yes.  Yes.

17        Q.    The ones at the real estate office,

18   was that also on Saturdays?

19        A.    It was at night, after hours, so

20   people could come from after work.

21        Q.    So weekdays?  After hours on

22   weekdays?



ALLISON COUGILL                                    November 13, 2013
THOMAS SEHLER v. PROSPECT MORTGAGE                          161

1        A.    Yes.

2        Q.    How far from your office was the

3    real estate office?

4        A.    It was about 30 minutes.

5        Q.    Did you ever do, when you worked at

6    Prospect, field visits to your existing

7    referral partners?  Like real estate offices.

8        A.    Not that I remember.

9        Q.    Would you do meetings with builders?

10       A.    I don't work with very many

11   builders.  No.

12       Q.    Would you do presentations?

13       A.    I did some presentations for one of

14   my real estate offices a couple of times at

15   lunch.  I did like --

16             It's called a Lunch & Learn.  Maybe

17   one or two.

18       Q.    One or two?

19       A.    Right.

20       Q.    And how long would those last?

21       A.    An hour.

22       Q.    And where were those located?

1       A.      The one I remember doing for the

2    realtor Exit office in Midlothian.   So --

3       Q.      And how far is that from your --

4       A.      About 35 minutes?

5       Q.      -- branch office.

6               Did you ever attend trade shows?

7       A.      Yes.

8       Q.      How often?

9       A.      Maybe once a year.

10      Q.      And how long would you spend at the

11   trade show?

12      A.      A couple of hours.

13      Q.      Where would it take place?

14      A.      Convention Center in Richmond.

15      Q.      How far is that from the branch

16   office?

17      A.      20 minutes.

18      Q.      Did you ever attend Chamber of

19   Commerce events?

20      A.      No.

21      Q.      Did you ever distribute flyers?

22      A.      Yes.



1      Q.    How often?

2      A.    Not very often.  I usually just

3  e-mailed them to my real estate agents.  It had

4  my marketing information on it so they can give

5  it to their prospective clients or something

6  like that.  But every now and then I bring them

7  to the open houses.

8      Q.    So you would either e-mail them to

9  agents or you would bring them with you to open

10  houses?

11      A.    Yes.

12      Q.    Did you ever have breakfast, lunch

13  or dinner with any of your referral sources.

14      A.    Yes.

15      Q.    How often?

16      A.    Once every couple months.

17      Q.    How long would you spend at each

18  meeting?

19      A.    About an hour.

20      Q.    All in Richmond?

21      A.    Yes.

22      Q.    Would you ever have meetings with

1    week working on my marketing.

2        Q.    Earlier in this deposition you

3    testified that you used to belong to a Group

4    called Business Network International?

5        A.    Yes.

6        Q.    And you belonged to that

7    organization for about three years, right?

8        A.    Correct.

9        Q.    And you would spend an hour and a

10   half for lunch every week?

11       A.    Not every week.  They were held

12   every week, but I couldn't always make it every

13   week because I was just busy in the office

14   doing loan originations or --

15       Q.    So how often would you attend their

16   meetings?

17       A.    At least twice a month.

18       Q.    All these meetings that I just

19   mentioned, closings, open houses, Home Buyer

20   Seminars, visits and meetings with realtors,

21   trade shows, those sorts of things, would you

22   agree with me those are all sales activities.



1       A.      No.

2       Q.      Why not?

3       A.      They're relationship building

4   activities.  I didn't have anything to sell to

5   them.  I didn't have a trinket to sell.  It was

6   all about relationships to me.  It's just my

7   opportunity to get in front of somebody that

8   has a similar goal in mind, and that's to meet

9   the client that wants to buy a home.  And it's

10  about a relationship.  I don't have anything to

11  sell?

12      Q.      Would you agree with me that

13  relationship building is important to selling?

14      A.      Yes.

15      Q.      Now you were selling home

16  residential loans when you worked at Prospect?

17      A.      I wasn't selling anything.  I was

18  originating residential mortgage loans.

19      Q.      Well, you were offering residential

20  mortgage loans, right?

21      A.      Correct.

22      Q.      And what was your production like



1    when you were at Prospect?

2       A.    Some days it was good and some

3    months it was bad.  It was up and down.

4       Q.    There were minimum production

5    standards, right?

6       A.    Did think have minimum production --

7       Q.    Prospect had minimum production

8    standards?

9       A.    Yes.

10      Q.    And did you meet those production

11   standards?

12      A.    Yes.

13      Q.    How much --

14            What was the highest percentage of

15   time you would say that you would spend outside

16   of the office in a week working for Prospect?

17      A.    A half percent.

18      Q.    A half percent?

19      A.    I was hardly ever out of the office.

20   As far as on a weekly basis during the day,

21   business day of the week, I would go to a

22   lunch, like I said, BNI.  That was once a week



1              -- once a year.  On a weekly

2     basis --

3          Q.    You were doing a number of things

4     outside the office, right?  You attended open

5     house.

6          A.    Those were on the weekend.

7          Q.    You had these Home Buyer Seminars?

8          A.    Those are at night.

9          Q.    Are you not counting the time you

10    spent on the weekends when you say you spent a

11    half percent of your time outside of the

12    office?

13         A.    Your question was doing --

14              You didn't ask me about the weekends

15    or at night when I did them.  You just said

16    outside the office, normal business hours.

17         Q.    Did you think my question was how

18    much time you were spending outside the office

19    in the business week?

20         A.    During business week.  Yes.

21         Q.    Okay.  So if we are not --

22              If you are not --



1        Q.      Working for Prospect.

2        A.      Working in what --

3                I'm trying to get to what type of

4    work.  I mean, the open houses?  Or --

5        Q.      I'm not limiting it.  Anything you

6    did for Prospect.

7        A.      How many hours a week?

8        Q.      Yes.  And I'm including the

9    weekends.

10       A.      Okay.  I don't know.  For the three

11   years I worked there I don't know how many

12   hours.

13       Q.      Can you estimate?

14       A.      On average I would work two open

15   houses a month for four to five hours each, and

16   I did that for almost three years.  I worked

17   weekends.  I worked at night.

18       Q.      I'm not asking you about --

19       A.      All those hours.

20       Q.      I'm asking you about the time you

21   spent outside of the office for Prospect.  So

22   that includes open houses.  That includes the



1    trades shows.  That includes the meetings with

2    the realtors.  All those things.  Give me an

3    estimate of how many hours a week on average

4    that you think you worked outside of the office

5    and outside of your home office?

6         A.    15 to 20 hours a week.

7         Q.    So 15 to 20 hours a week working

8    outside of the office, plus 20 hours a week at

9    home?

10        A.    Yeah.  You just told me to include

11   it together.

12        Q.    No.  I told you not to include the

13   time that you worked at home.

14        A.    Okay.  Here's my average day.  I

15   would go to the office.  I would work from

16   8 o'clock till 5 or 6 o'clock.  I'd go home.  I

17   would spend another four hours at home working.

18   On the weekends I'd go to an open house for

19   four to five hours twice a month.  I would go

20   to a trade show once a year, five, six hours.

21   I'd take a realtor to lunch an hour once a

22   month.  You add it up.



1       Q.      That's --

2       A.      That's what I did --

3       Q.      That's all?

4       A.      -- on a regular basis.  I worked

5  from, you know, 8 in the morning till 6 at

6  night in the office.  I'd go home and work at

7  night.  I'd go to the open houses I was

8  required to.  I taught my Home Buyer Classes.

9  I did whatever.  I don't know how to add it up.

10  I didn't keep a time clock.  I don't know how

11  many hours.

12              I worked on the weekends.  I took

13  loan applications on the weekends.  I worked

14  all the time for Prospect Mortgage.

15      Q.      How many face-to-face meetings would

16  you have with realtors in any given week?

17      A.      Very few.  I didn't go face-to-face

18  with my realtors on a weekly basis.

19      Q.      And how many hours a week do you

20  estimate that you were working total for

21  Prospect?

22      A.      Per week?



1      Q.     Yes.

2      A.     70.  60 to 70 hours week.  I just

3   worked all the time.

4      Q.     Well, tell me what was different

5   about working at Prospect that meant you were

6   working 60 to 70 hours in a week, whereas you

7   were working 40 to 55 hours a week at some of

8   your prior jobs?

9      A.     I wasn't required to do what

10   Prospect Mortgage asked me to do.

11      Q.     What was that?

12      A.     I was not required to do open houses

13   on the weekend.  I was not required to do Home

14   Buyers Marketing.  I was not required to, you

15   know, call the agents on the Hour of Power

16   every Friday and then follow up with another

17   conference call to Todd Duncan.  I was just

18   able to originate and do my job.  But all the

19   hours.

20      Q.     You admit that Prospect required you

21   to do open houses, right?  On the weekends.

22      A.     Yeah.  They required.



1     Q.     And Prospect required you to do Home

2   Buyers Marketing?

3     A.     Yes.

4     Q.     And Prospect required you to do Hour

5   of Power to try to get more meetings with

6   people, right.

7     A.     Yes.

8     Q.     Is there any other reason why the

9   amount of hours you were spending in the office

10  was much larger than at your prior places of

11  employment?

12    A.     No.  I don't know.

13    Q.     So your testimony is that you had a

14  home office.  Is that right?

15    A.     Yes.

16    Q.     Do you have a separate room in your

17  home that you dedicated to an office?

18    A.     Yes.

19    Q.     Did it have a separate phone line?

20    A.     Yes.

21    Q.     Did you have a computer in that

22  office?



1    identification.)

2        Q.    The court reporter has handed you

3    what's been marked as Cougill Exhibit 10.   Do

4    you recognize this document?

5        A.    Yes.

6        Q.    This is a Schedule A of Form 2106

7    that you submitted it to IRS with your 2009 tax

8    return, right?

9        A.    Yes.

10       Q.    And in 2009 you reported in Line 21

11   that you had $12,503 in business --

12             -- un-reimbursed employee expenses

13   in 2009, right?

14       A.    Yes.

15       Q.    And tell me how did you come to that

16   number 12,503?

17       A.    Again, with my receipts for business

18   expenses that the accountant asked me for,

19   including my cell phone bill and my car

20   expenses.

21       Q.    Cell phone, car, what else?

22       A.    Meals, entertainment.



1      Q.    What else?

2      A.    And my mileage.

3      Q.    Anything else?

4      A.    No.

5      Q.    If you turn to the second page,

6    which is the first page of Form 2106, you

7    reported $485 in meals and entertainment

8    expenses in 2009.

9      A.    Page 2?

10     Q.    On the second page.

11     A.    I'm sorry.  On the wrong page.

12     Q.    Line 5 you reported $485 in meals

13   and entertainment expenses.

14     A.    Yes.

15     Q.    And can you tell me what was that

16   for?

17     A.    Meals and entertainment.  I suppose

18   that was taking somebody to lunch or cup of

19   coffee or things that I had to pay for.

20     Q.    Lunch and coffee.  Anything else?

21     A.    I'm not sure without looking at the

22   receipts, but if they were under that meals and



1    entertainment, they must have had a receipt for

2    that category.

3        Q.    How many lunches do you think you

4    took people on in 2009?

5        A.    I don't know.

6        Q.    How much would you spend generally

7    on average on a lunch for a real estate agent?

8        A.    $35 maybe.

9        Q.    And how much would you spend

10   generally for coffee?

11       A.    $15.

12       Q.    If you turn to the third page of the

13   document, that's the second page of the form

14   2106.  You reported that you drove

15   12,649 miles, business miles, in 2009.  This is

16   Line 13.  You see that, right?

17       A.    Yes.

18       Q.    And did you in fact drive 12,649

19   miles for business?

20       A.    I didn't calculate it.  I just gave

21   him the odometer reading as I did the year

22   before.



1    Q.    So you didn't actually drive

2    12,649 miles?

3    A.    I don't know.

4    Q.    So this document, for all you know,

5    is not accurate?

6    A.    As far as I know it is accurate

7    because I paid the accountant to be accurate

8    and file my tax returns accurately to the IRS.

9    Q.    Well how did you --

10         So looking even further, your tax

11   return states on Line 14 that 90 percent of

12   your car use was for business use.

13   A.    Because I go to work in the morning,

14   I stay there all day, and then I come home.  I

15   drive back and forth to work, and occasionally

16   I go on appointments and I don't drive it

17   anywhere else for leisure.  That's it.

18   Q.    So you're including commuter time or

19   commuting use into that calculation?

20   A.    Commuting to back and forth to work?

21   Q.    Yes.

22   A.    That's all I do.  I go to work all



1   the time, every day of the week.  90 percent of

2   my time I suppose it's correct that I go to

3   work and I come home and I use my car to go on

4   appointments and whatever else I have to do for

5   work.

6       Q.    So that includes commuting time?

7       A.    I don't drive to the movies.  I

8   don't go to lunch with my friends.

9       Q.    Your accountant calculated this

10  mileage based --

11          -- including the amount of commuting

12  time that you spend using your car?

13      A.    I assume, yes.

14      Q.    Look at Question No.18.  It asks:

15          "Was your vehicle available for

16  personal use during off duty hours?"

17          And you checked "no".  Is that

18  right?

19      A.    I didn't check that box.

20      Q.    You didn't fill out this form so you

21  are taking no responsibility for what's on this

22  form?



1      A.    I did not fill this out.

2      Q.    You submitted it to the IRS, right?

3      A.    My accountant submitted it to the

4   IRS.

5      Q.    And you didn't review it before you

6   submitted it to the IRS?

7      A.    I signed it.

8      Q.    You signed it without reading it?

9      A.    Yes.

10      Q.    Without agreeing with it?

11      A.    Yes.

12      Q.    Without understanding it?

13      A.    I paid the accountant to do his job,

14   and I expected him to do his job.  And if he

15   didn't do it right, he's accountable to the

16   IRS.

17      Q.    So if the IRS comes calling and

18   asking you about this Schedule A on 2106,

19   you're going to say it's the accountant's

20   fault?

21      A.    Yes, I will.

22      Q.    Well, regardless of who filled out



1    the form, you're representing to the IRS that

2    you spent 12,600 --

3            -- that you drove 12,649 miles for

4    business purposes in 2009, right?

5            MR. ZAUN:  Objection, asked and

6    answered.

7            THE WITNESS:  Yes.

8    BY MS. MURAKAMI:

9        Q.    And that's about 243 miles a week,

10   right?

11       A.    You do the math.

12       Q.    I did the math beforehand.  And if

13   you're estimating a 52-week year, that's about

14   243 miles a week.

15       A.    Okay.

16       Q.    You don't have any reason to doubt

17   that, right?

18       A.    Right.

19            (Exhibit 11 marked for

20   identification.)

21       Q.    The court reporter has just handed

22   you what's been marked as Cougill Exhibit 11.

ALLISON COUGILL
THOMAS SEHLER v. PROSPECT MORTGAGE

November 13, 2013
200

1    Do you recognize this document?

2        A.    Yes.

3        Q.    This is your Schedule A and Form

4    2106 that you submitted to the IRS with your

5    2010 tax return?

6        A.    Yes.

7        Q.    In 2010 reported to the IRS that you

8    spent $10,783 in un- reimbursed employee

9    expenses.  Is that right?

10       A.    Yes.

11       Q.    And can you tell me how you reached

12   that number of 10,783?

13       A.    I gave him the receipts for all my

14   business expenses.

15       Q.    And what business expenses are

16   those?

17       A.    Those would have included my cell

18   phone bill, my car expenses, meals and

19   entertainment, licensing, anything else.

20       Q.    On the second page of Form 2106 you

21   reported that you spent $848 for meals and

22   entertainment expenses in 2010, right?



1     A.    Yes.

2     Q.    That's almost double what you spent

3  in 2009, right?

4     A.    Yes.

5     Q.    And how did you come to spend almost

6  double on meals and entertainment in 2010?

7     A.    I joined the BNI Group in 2010, I

8  believe.

9     Q.    So are you saying that you spent

10  money for BNI?

11     A.    Yes.

12     Q.    How much?

13     A.    I don't have the receipts in front

14  of me, but I'm assuming that the fact that I

15  had to purchase my own lunch when I went to the

16  group meetings.  We moved from one -- like an

17  inexpensive diner -- to a country club that

18  year.

19     Q.    So the cost a month was more?

20     A.    I didn't eat lunch at the prior

21  place because I don't normally eat lunch.  But

22  I had to pay for my lunch in 2010 and 11



```
 1   because we moved to the country club and that

 2   included to be able to be sitting at the table

 3   I had to purchase lunch.

 4       Q.    On the third page of the document

 5   which is the second page of Form 2106 you

 6   reported that you drove 10,833 miles in 2010

 7   for business purposes.  Did you drive 10,833

 8   miles for business purposes in 2010?

 9       A.    I don't know.

10       Q.    How did you come to that number?

11       A.    I gave my accountant my odometer

12   reading for the beginning of the year and the

13   ending of the year, and he calculated the

14   business miles.

15       Q.    You didn't give him any other

16   information regarding your actual use of your

17   car for business purposes in 2010, right?

18       A.    Right.

19       Q.    So this number is not accurate?

20       A.    It's accurate to me.

21       Q.    It's accurate to you because the

22   accountant calculated it?
```



1     A.    Yes.

2     Q.    But you don't know if that's

3  actually the number of miles that you drove for

4  business purposes in 2010?

5          MR. ZAUN:  Objection.  Asked and

6  answered.

7  BY MS. MURAKAMI:

8     Q.    You can answer the question.

9     A.    I told you already.  I gave him my

10 mileage.  He calculated it based on what his

11 knowledge is as a CPA that I can take for my

12 total mileage.  And otherwise he would ask me

13 to keep a business log.  Every single year he

14 has asked me for my beginning mileage and my

15 ending milage, period.  That's all he's asked

16 me for.

17    Q.    So your accountant just assumes how

18 much time you spent actually?

19    A.    I can't answer that question.  I

20 can't answer that.  I don't know what he

21 assumes and what he doesn't.

22    Q.    Either way, you represented it to



1    the U.S. Government that you drove 10,833 miles

2    for business purposes in 2010?

3        A.    Correct.

4        Q.    And No.18 states:

5              "Was your vehicle available for

6    personal use during off duty hours?"

7     you checked "no".

8        A.    I didn't check anything.  But he

9    did.  He didn't ask me that.

10       Q.    He submitted this form on your

11   behalf?

12       A.    Yes.

13       Q.    And you should have reviewed it

14   before he submitted it to the IRS, right?

15       A.    Excuse me.

16       Q.    You should have reviewed the

17   document before you submitted it to the IRS?

18       A.    I didn't.

19       Q.    You didn't review it?

20       A.    No.

21             I don't know the law.  If I --

22       Q.    There's no question before you.



```
 1              No. 2 asks:

 2              "Do you have evidence to support

 3    your deduction?"

 4              And you checked "yes".

 5              Do you have evidence to support your

 6    deduction?

 7        A.    Yes.

 8        Q.    What's your evidence?

 9        A.    My receipts.

10        Q.    Do you have any evidence to support

11    your deduction that related to your mileage?

12        A.    Yes.  My odometer reading.

13        Q.    Only the beginning and the ending,

14    right?  For each year.

15        A.    Correct.

16        Q.    And that's all?

17        A.    Correct.

18        Q.    You have a house, don't you, on the

19    Rappahannock River?

20        A.    Yes.

21        Q.    When did you get that house?

22        A.    2005.
```



ALLISON COUGILL
THOMAS SEHLER v. PROSPECT MORTGAGE

November 13, 2013
206

1     Q.    Do you ever drive your car to the

2  house on the Rappahannock?

3     A.    Yes.

4     Q.    So given that, then it's probably

5  not accurate to say that you used your car

6  90 percent of the time for business?

7     A.    I don't know what's accurate or not.

8  It's not accurate.  I didn't make this return.

9  I gave him what he asked me for.  He's the

10  accountant.  He filed the tax on my behalf.

11     Q.    How often do you go to your house on

12  the Rappahannock?

13     A.    It varies.

14     Q.    Can you give an estimate?

15     A.    Once or twice a month.

16     Q.    All year?

17     A.    Yes.

18     Q.    And how far is the house from where

19  you live?

20     A.    90 miles.  But I don't always drive

21  my car.

22         (Exhibit 12 marked for



1    identification.)

2        Q.     The court reporter has just handed

3    you what's been marked as Cougill Exhibit 12.

4    Do you recognize this document?

5        A.     Yes.

6        Q.     This is your Schedule A and Form

7    2106 that you submitted with your 2011 tax

8    return?

9        A.     Yes.

10       Q.     And in 2011 you reported spending

11   $13,782 in un- reimbursed employee expenses on

12   Line 21, right?

13       A.     Yes.

14       Q.     And how did you reach that number?

15       A.     I gave any accountant my business

16   expenses.

17       Q.     And what are those business

18   expenses?

19       A.     My cell phone, my car expenses, my

20   meals, entertainment, licensing, expenses,

21   client gifts, closing gifts.

22       Q.     And on the second page of the

1    document, this is the first page of Form 2106,

2    you reported spending $772 in meals and

3    entertainment expense?

4        A.    Yes.

5        Q.    And can you tell me what were those

6    meals and entertainment expenses?

7        A.    Those were the meals that I paid for

8    to either get work at my BNI Group, or take

9    those BNI --

10            -- meet those BNI people for coffee

11   or lunch.

12       Q.    On the third page of the document,

13   Form 2106, you reported to the IRS that on Line

14   13 that you drove 9,927 business miles in 2011.

15   Is that right?

16       A.    Yes.

17       Q.    In fact, the percent of business use

18   on Line 14, 75 percent, is exactly the same

19   percentage that you reported on your 2010

20   return as well, right?

21       A.    Correct.

22       Q.    So it looks like what your



1    accountant did is he chose a percentage, then

2    he reported that as your business miles?

3            MR. ZAUN:  Objection.  Calls for

4    speculation.

5            MS. MURAKAMI:  If you know.

6            THE WITNESS:  I have no idea.

7    BY MS. MURAKAMI:

8        Q.    And you don't have a mileage log for

9    the miles that you drove in 2011, do you?

10       A.    No.

11       Q.    When you worked at Prospect

12   Mortgage, did you take a lunch break?

13       A.    No.

14       Q.    You never took a lunch break?

15       A.    I won't say "never", but I don't eat

16   lunch during the day.

17           (Exhibit 13 marked for

18   identification.)

19       Q.    The court reporter has handed you

20   what's been marked as Exhibit 13.  Do you

21   recognize this document?

22       A.    Yes.



1      Q.     This was among the documents that

2    you produced today, right?

3      A.     Yes.

4      Q.     And is this part of your credit card

5    report from American Express?

6      A.     Yes.

7      Q.     And so there are a number of

8    expenses incurred at the beginning of --

9           -- throughout 2011 at a number of

10   restaurants, including Panera Chipotle, Pizza

11   Hut, et cetera?

12          Can you give me an explanation for

13   those expenses?

14     A.     Yes.  Basically the Panera is where

15   we met for the BNI, if we met.  The BNI Group

16   consisted of 20 to 25 members of all different

17   professions that we used to meet with.  They

18   called it a face-to-face, 30 minute meeting to

19   try to get to know each other better so we

20   could refer business to each other.  That was

21   what the BNI Group was all about.  So besides

22   having the lunch meeting, we would try to have



1    one-on-one meetings.

2        Q.    So these Panera meetings are in

3    addition to the lunch meetings that you talked

4    about earlier?

5        A.    Correct.

6        Q.    Okay.  What about the other charges?

7        A.    Just various restaurants where

8    sometimes --

9              Obviously, Pizza Hut, this could

10   have been a Lunch & Learn that I did because I

11   provided a pizza.  Panera, Chipotle, might have

12   been a meeting I met somebody, again, for a

13   BNI.

14       Q.    Okay.  Anything else?

15       A.    Same with Chili's.  They're very

16   small charges, so they're probably lunches.  We

17   didn't pay for each other's lunches.  We just

18   paid for our own.

19             MS. MURAKAMI:  Could I look at that

20   time Document one more time?

21             So for each of these expenses under

22   bar and cafe in 2011 are you saying that all of



1    Q.    How often?

2    A.    I took one week off.  I think it was

3    in '08 and I went to our river house during

4    the, I think it was July 4th holiday.

5    Q.    Okay.

6    A.    I worked the entire time.

7    Q.    So you didn't actually take off?

8    A.    I worked from my house almost the

9    entire week.

10   Q.    Any other weeks you remember where

11   you took off?

12   A.    No.

13   Q.    You resigned from Prospect, right?

14   A.    Yes.

15   Q.    In October of 2011?

16   A.    October 3rd.

17         2d or 3rd.

18   Q.    And why did you resign?

19   A.    Because I worked too many hours and

20   I didn't get paid enough money.

21   Q.    Any other reason?

22   A.    That was the only reason I resigned.

ALLISON COUGILL
THOMAS SEHLER v. PROSPECT MORTGAGE

```
 1   I got a better offer for more money and hoped

 2   that I wouldn't have to work as many hours and

 3   do as many activities as they required.

 4              (Exhibit 14 marked for

 5   identification.)

 6      Q.    The court reporter has handed you

 7   what's been marked as Cougill Exhibit 14.  Do

 8   you recognize this document?

 9      A.    Yes.

10      Q.    And this is the your 2008 W-2's?

11      A.    Yes.

12      Q.    And so in 2008 you received a W-2

13   from IndyMac where you received $20,603 in

14   wages tips and other compensation in 2008?

15      A.    Yes.

16      Q.    And this is income you earned prior

17   to Prospect taking over for IndyMac?

18      A.    Yes.

19      Q.    And so then the second page is your

20   2008 W-2 from MetroCities Mortgage.  And

21   MetroCities was a Prospect company, right?

22      A.    Yes.
```

1   least one?

2       A.    A lunch appointment it looks like

3   with Jane Renger.

4            (Exhibit 21 marked for

5   identification.)

6       Q.    The court reporter has handed you

7   what's been marked as Cougill Exhibit 21.  Do

8   you recognize this document?

9       A.    Yes.

10      Q.    And what is this document?

11      A.    This is a business plan that I may

12  have submitted to Rick Eaheart.

13      Q.    Were all the loan officers required

14  to submit business plans?

15      A.    Yes.

16      Q.    And would you submit it at the

17  beginning of the year?

18      A.    I suppose.  Probably at the end of

19  the year for next year.

20      Q.    So like at the end of 2010 you

21  submitted the plan for 2011?

22      A.    I assume.  Yes.



ALLISON COUGILL                                      November 13, 2013
THOMAS SEHLER v. PROSPECT MORTGAGE                              231

1        Q.    And so your goal was to close a loan

2    every 2.5 days.  Is that right?

3        A.    Looks like it.  Yes.

4        Q.    At the bottom of Page 1 lists a

5    number of prospecting sources.  Can you tell me

6    about those?  Who are those people?

7        A.    Those were my referral partners.

8        Q.    Are they all real state agents?

9        A.    Yes.

10       Q.    Fort Lee No. 1, what does that mean?

11       A.    Not sure, but that's where I did my

12   Home Buyer Classes.

13       Q.    So was it a priority for you to do

14   the Home Buyer Classes?

15       A.    Priority?  It wasn't a priority, but

16   it was on part of my business plan.

17       Q.    It was part of your plan to do the

18   Home Buyer Seminars?

19       A.    Correct.

20       Q.    At Fort Lee?

21       A.    Right.

22       Q.    If you look at the second page of



1  Exhibit 21, at the bottom of the page you note

2  a number of tools, right?

3       A.     Correct.

4       Q.     And part of your goal was to meet

5  with two agents weekly for HBM Dialing For

6  Dollars?

7       A.     Correct.

8       Q.     What is Dialing For Dollars?

9       A.     Hour of Power.

10      Q.     Hour of Power.  Just another name?

11      A.     Yes.

12      Q.     So you had a goal to meet

13  face-to-face with two agents weekly?

14      A.     Correct.

15      Q.     And you had a goal to do four to six

16  monthly open houses?

17      A.     Correct.

18      Q.     Did you actually do four to six

19  monthly open houses?

20      A.     I don't know.  I don't remember.

21             Every month varied.  It depended.

22  We did the open houses on the foreclosed



```
 1              (Exhibit 22 marked for

 2    identification.)

 3       Q.    The court reporter has handed you

 4    what's been marked as Cougill Exhibit 22.  Do

 5    you recognize this document?

 6       A.    Yes.

 7       Q.    This is also among the documents

 8    that you produced to us today, right?

 9       A.    Yes.

10       Q.    Can you tell me what the document

11    is?

12       A.    This is just a notification that one

13    of the loans that I had in the pipeline closed

14    successfully, and that is the funding amounts.

15       Q.    So this is just an automatic e-mail

16    that you get once a loan is closed?

17       A.    Yes.  It came out of the system they

18    used, the production system, operation system.

19    So it was automatically generated once the loan

20    reached certain stages of the process and once

21    it funded it was automatically sent to us in an

22    e-mail with the steps that they wanted us to
```



ALLISON COUGILL                                                November 13, 2013
THOMAS SEHLER v. PROSPECT MORTGAGE                                          236

 1    follow to leverage, again, more contacts.

 2        Q.    At the bottom of the e-mail under

 3    "Other Things to Remember" there are five

 4    things listed.  Questions listed there, right?

 5        A.    Correct.

 6        Q.    It looks like there are questions

 7    that the company is asking you to think about.

 8    Is that right?

 9        A.    Correct.

10        Q.    And the third question asks:

11              "How much time I'm spending

12    prospecting versus desk sitting."

13              Do you see that?

14        A.    Yes.

15        Q.    And what do you interpret that to

16    mean?

17        A.    How much time I spend prospecting

18    versus desk sitting.  Doing what they used to

19    call -- there's a term for it that they had --

20    means what activities am I doing to drive

21    business, you know, to close loans versus just

22    sitting at your desk doing nothing.



ALLISON COUGILL                                    November 13, 2013
THOMAS SEHLER v. PROSPECT MORTGAGE                              240

 1   with but had to sign anyway.

 2       Q.     Except For the Employment Agreement

 3   and the Outside Sales Agreement, right?  Which

 4   is what you received in writing.

 5       A.     Correct.

 6       Q.     Ms. Cougill, nobody told you there

 7   were a certain number of hours you needed to

 8   spend in the office, right?

 9       A.     Nobody told me there were a certain

10   number of hours I had to spend in the office?

11       Q.     Right.

12       A.     No.

13       Q.     No one told you that you had to be

14   at your office at 9 or 8 or whatever time you

15   arrived at the office?

16       A.     No other than the calls we had with,

17   you know, the Todd Duncan's, the Hour of Power.

18       Q.     Other than the scheduled meetings

19   and trainings?

20       A.     Yes.

21       Q.     But you didn't have set office

22   hours?

